**UNITED STATES of America ex rel. James L. MILLER, Petitioner,**

v.

**Jerry D. GILMORE, and Attorney General of the State of Illinois, Respondents.**

**No. 88 C 4936.**

United States District Court, N.D. Illinois, E.D.

Aug. 14, 1989.

James L. Miller, East Moline, Ill., pro se.

Terence Madsen, Richard S. London, Asst. Attys. Gen., Chicago, Ill., for respondents.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

On the afternoon of March 31, 1980, Cheryl Armstrong was watching television in her first-floor apartment on the West Side of Chicago. Armstrong was caring for her two small children and her cousin's six-month-old infant. While carrying the infant and going to check on the condition of one of her children, a man confronted her in the hallway of her flat. The man brandished a knife, and threatened to kill Armstrong and the baby. Nothing covered the man's face, and the hall was brightly lit.

The man put the knife to Armstrong's back and forced her, babe in arms, into a well-lighted bedroom. The man then bound and gagged Armstrong, and began robbing the apartment. The man reentered the bedroom several times in the course of the robbery, giving Armstrong clear views of her assailant each time. The entire event lasted 25 minutes.

Three weeks later, Armstrong went to the headquarters of the Area 4 Violent Crimes Unit of the Chicago Police Department. She met there with Detective Gregory McHugh. McHugh had met Armstrong two weeks earlier and made a report based on Armstrong's version of the incident. At the station, McHugh gave Ms. Armstrong several albums containing mug shots. He had left Armstrong alone for fifteen minutes when Armstrong summoned him. Open in front of her was a picture of a man whom Armstrong said robbed her. The man in the photograph was James Miller. Upon learning of Miller's identity, McHugh issued a "stop order," which was an internal Department notice that alerted officers that a person was wanted in a case under investigation.

On May 23, 1980, Detective Steve Steele went to the Department's 15th District Station to arrest Miller in connection with the Armstrong robbery. Police had brought Miller to the 15th District on other charges, but the stop order apparently served its purpose of ensuring that Miller was not released prematurely. Soon after his arrest Miller received appointed counsel. According to Miller, his counsel requested that the state produce all possible exculpatory materials which it or the Chicago Police had in its possession. The state tendered certain materials, but it did not provide the stop order.

Miller's case proceeded to trial, and based on the testimony of Armstrong and others, a jury found Miller guilty of armed robbery, armed violence, home invasion, burglary, and unlawful restraint. The trial court sentenced Miller to concurrent terms of 25 years for the first three offenses, seven years for burglary, and three years for unlawful restraint.

Miller appealed his conviction to the Illinois Appellate Court in 1982. As part of this appeal, Miller filed a pro se brief alleging that the state withheld and subsequently destroyed material exculpatory information, in violation of his right to due process under the Fourteenth Amendment. The appellate court declined to address this argument apparently because the facts supporting Miller's contention were outside the trial court record. The appellate court then affirmed his conviction, and the Illinois Supreme Court denied Miller leave to appeal. See *People v. Miller*, 93 Ill.2d 546 (1983).

Miller subsequently petitioned the Circuit Court of Cook County for relief under Ill. Rev.Stat. ch. 38, §§ 122–1 et seq. (1979). Miller repeated his due process claim, which the circuit court dismissed. Miller appealed once again. Meanwhile, Miller attempted to seek redress from the federal courts. He filed suit under 42 U.S.C. § 1983 (1982) for damages for the City's denying him due process in withholding information, and sought a writ of habeas corpus. Miller's civil rights suit survived a motion for summary judgment before the City settled the case. See *Miller v. City of Chicago*, No. 82 C 4080, mem. op. (N.D.Ill. May 17, 1984) (denying City's motion for summary judgment; material issue as to whether City destroyed exculpatory documents); *Miller v. City of Chicago*, No. 82 C 4080 (N.D.Ill. April 23, 1985) (minute order entering judgment for Miller by stipulation). This court dismissed Miller's peti-

tion for a writ of habeas corpus for his failure to exhaust state remedies. The Illinois Appellate Court then affirmed the dismissal of Miller's petition for post-conviction relief on March 31, 1988, a decision which the Illinois Supreme Court denied Miller leave to appeal.

Miller thus has returned to this court, petitioning once again under 28 U.S.C. § 2254 (1982) for a writ of habeas corpus. He restates his arguments that the state denied him due process under the Fourteenth Amendment by withholding and destroying potentially exculpatory evidence. The state insists that Miller should not get relief, essentially because Miller has not shown how the withheld or destroyed evidence would have helped him. This argument, were the court to accept it, would place prisoners like Miller in a paradoxical position: in order to obtain a new trial, the prisoner would have to show that the evidence would have made a difference, but since the state has allegedly destroyed the evidence, such a showing could be impossible.

In order to resolve this paradox, the court will look more closely at the right which Miller claims. The Due Process Clause of the Fourteenth Amendment requires states to disclose material information to a criminal defendant that would tend to exculpate the defendant, especially when the defendant requests production of the information. See *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 1197, 10 L.Ed.2d 215 (1963); *United States v. Bagley*, 473 U.S. 667, 674–76, 105 S.Ct. 3375, 3379–80, 87 L.Ed.2d 481 (1985) (Blackmun) (applying Due Process Clause of Fifth Amendment). Evidence is "material" for purposes of the Due Process Clauses "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* 473 U.S. at 682, 105 S.Ct. at 3383. See also *U.S. v. Herrera–Medina*, 853 F.2d 564, 567 (7th Cir.1988).

The problem with applying the due process requirements of *Brady* and *Bagley* to this case is that the record does not indicate what the withheld or destroyed evidence is. Were the court to construe the record most favorably to the state, the missing evidence was a simple stop order, one stating that officers should contact Area 4 were Miller apprehended and listing McHugh as the issuing officer. But were the court to take Miller's allegations as true, the state withheld or destroyed exculpatory files that accompanied the stop order, in accordance with a practice akin to the Chicago Police Department's practice of maintaining "street files." See *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir.1988) (describing practice). Without knowing what the evidence was, no court can determine if the evidence was "material."

The Supreme Court recently addressed the difficulty of guaranteeing due process in cases like this one in *Arizona v. Youngblood*, —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). There the state obtained evidence relating to a sexual assault on a minor. Rather than analyzing the evidence close to the time of the assault, the police waited ten days. A police criminologist then tested the evidence in accordance with standard procedures, and prepared written notes of his findings.

Police later arrested and charged Youngblood with the crime. After receiving a *Brady*-style request for exculpatory information, the state produced all relevant police reports, including the criminologist's findings, as well as allowed Youngblood's expert to examine the forensic evidence. Youngblood contended at trial, however, that had the state tested the samples closer to the time of the crime, or had stored the evidence better, the evidence could have exculpated him. The jury convicted Youngblood, but the Arizona courts reversed the conviction, holding that when identity is an issue and the state is responsible for the destruction of possibly exculpatory evidence, such destruction amounts to a denial of due process. *Id.* 109 S.Ct. at 336, 335.

The Supreme Court reversed the Arizona court and remanded for further proceed-

**30**

ings. The court noted first that the state had complied with *Brady* by producing all of its reports. The question for the court thus became whether the Due Process Clauses imposed some other duty "over and above that imposed by cases such as *Brady*...." The Court reviewed its precedents regarding the loss of possibly exculpatory evidence, noting that when such evidence is lost, "courts face the treacherous task of deciding the import of materials whose contents are unknown and, very often, disputed." The court hesitated, however, to impose upon police "an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution." Instead, the court held that the loss of evidence could constitute a denial of due process only when the criminal defendant demonstrates that state officials acted in bad faith. *Id.* 109 S.Ct. at 336, 337, quoting *California v. Trombetta*, 467 U.S. 479, 486, 104 S.Ct. 2528, 2532, 2533, 81 L.Ed.2d 413 (1984).

*Youngblood* directs this court to inquire whether Chicago police lost or destroyed evidence in bad faith. This is a factual question, one not answered in prior proceedings. If this court eventually finds that the state destroyed evidence in bad faith, this may not end the inquiry: *Trombetta* holds that Miller must produce facts indicating at least a better than slim chance that the evidence that was allegedly destroyed could have exculpated him, and that he had no alternative means of producing this evidence. See *Trombetta*, 467 U.S. at 488–90, 104 S.Ct. at 2533–35.

Accordingly, the court gives Miller thirty days to submit to the court (1) what he believes the missing files contained, (2) why these materials could have exculpated him, and (3) why he had no alternative means of obtaining this evidence. The state will have fifteen days from the time of Miller's filing to respond. Once the parties have submitted these materials, the court will decide how to proceed further.